1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY J. JANTZ, | 1:10-cv-01553 GSA |
| Plaintiff, | **ORDER REGARDING PLAINTIFF'S** |
| v. | **SOCIAL SECURITY COMPLAINT** |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendants. | |

## BACKGROUND

Plaintiff Jenny J. Jantz ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability insurance benefits pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Gary S. Austin, United States Magistrate Judge.[1]

---

[1]The parties consented to the jurisdiction of the United States Magistrate Judge. (*See* Docs. 7 & 8.)

1

1

## FACTS AND PRIOR PROCEEDINGS[2]

2

In August 2007, Plaintiff filed an application for disability insurance benefits, alleging

3

disability as of May 16, 2006.  AR 109-111.  Plaintiff's application was denied initially and on

4

reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").

5

AR 69-77, 82-83.  Thereafter, ALJ Michael J. Kopicki held a hearing, and issued an order

6

denying benefits on August 28, 2009, finding Plaintiff was not disabled.  AR 14-25.  On May 7,

7

2010, the Appeals Council denied review.  AR 6-8.

8

### Hearing Testimony

9

ALJ Kopicki held a hearing on June 4, 2009, in Fresno, California.  Plaintiff appeared

10

and testified; she was represented by attorney Jeffrey Milam.  Vocational Expert ("VE") Cheryl

11

R. Chandler also testified.  AR 26-56.

12

At the time of the hearing, Plaintiff was forty-three years old.  She lived with her husband

13

and three children in Livingston, California.  AR 30-31.  Her children were nineteen, seventeen

14

and ten years of age, all of whom were attending school.  AR 31.  Her husband worked as a

15

carpentry estimator.  AR 30-31.

16

Plaintiff graduated high school and has received vocational training in real estate and

17

computer skills.  AR 31-32.  She is five feet, nine inches tall, weighs one hundred eighty-five

18

pounds, and is left-handed.  AR 32.

19

Other than sharing information about a nutritional supplement with others that permitted

20

her access to the same supplement at no cost, Plaintiff has not worked since the onset of her

21

disability.  AR 32-33.  She maintains a real estate license, but has not sold real estate.  AR 33.

22

She last worked for a mortgage company, but left the job because she "just wasn't feeling good,"

23

was "always stressed out," and was in pain.  AR 33.

24

25

26

27

[2]References to the Administrative Record will be designated as "AR," followed by the appropriate page
number.

28

1    When asked what affected her ability to work most significantly, Plaintiff responded

2  "[p]ain."  AR 33-34.  The pain is in her back, neck, arms and legs.  AR 34.  She was diagnosed

3  with fibromyalgia back in 1994 or 1996, but then she could manage working.  AR 34.  The

4  condition worsened in 2006, but Plaintiff could not explain how.  AR 36.  When asked whether

5  she takes medication to treat the fibromyalgia, Plaintiff testified that she had been prescribed the

6  following medications: Oxycontin, Hydrocodone, Cymbalta, and Imprimine.  AR 36.  She

7  indicated that the medications help "sometimes," but when she is in excruciating pain the

8  medications do not help.  AR 37.  The side effects of the medications make her feel "drugged."

9  AR 37, 47.

10    Plaintiff also treats her fibromyalgia by using ice once a week.  AR 47.  Difficulty

11  concentrating is an issue as well.  Plaintiff can read for about ten minutes before having to re-

12  read the passage.  AR 48.  Additionally, she does not remember what people tell her.  AR 55.

13  Plaintiff attributes her occasional inability to get out of bed and stand or walk to fibromyalgia.

14  Plaintiff estimated that she is unable to get herself out of bed about two days a week.  AR 54-55.

15  That inability is caused by pain and fatigue.  AR 54.  She occasionally has difficulty sleeping, but

16  even on good days does not awaken feeling refreshed.  AR 54.  Other than the pain and fatigue,

17  Plaintiff indicated she cannot be touched due to the tenderness she feels.  AR 55.

18    Plaintiff has had arthroscopic surgery on her left knee.  AR 34-35.  The surgery did not

19  alleviate the pain, nor did injections or physical therapy.  AR 35.  When asked where the pain

20  was located on the knee, Plaintiff indicated it was a sharp pain on the inside part of the knee.

21  Walking worsens the condition and elevating the knee relieves the pain.  AR 35.  The left knee is

22  worse than the right knee.  AR 35.  Swelling in the knees has always been a problem.  AR 46-47.

23  Plaintiff does not wear a brace, but will occasionally ice her left knee.  AR 47.

24    A Dr. Winkler is Plaintiff's primary care physician and she sees Lauren Anderson for

25  psychological therapy.  AR 37-38.  When she was asked whether she had symptoms of anxiety or

26  depression, Plaintiff described feeling hopeless because she is "in pain all the time" and is unable

27

28                                           3

to do what she wishes to do.  AR 38.  She felt anxiety and depression prior to filing her claim.
AR 39.  Plaintiff replied "I don't know" in response to whether the medications prescribed to her
help her and whether there are any side effects from those medications.  AR 38.  Plaintiff no
longer attends mental health counseling because Dr. Anderson "closed her practice."  AR 38.

Asked to describe a typical day, Plaintiff indicated that she gets up at 7 a.m. to wake her
children.  If she feels well enough, she makes her youngest breakfast and takes him to school.  If
she does not feel well, she goes back to bed and her two oldest children see to the youngest's
breakfast and get him to school.  AR 39.  Assuming she takes her youngest to school, she returns
home and cleans up the kitchen or lies down.  AR 39.  Plaintiff delegates the vacuuming,
sweeping and mopping to her children.  She does do laundry.  AR 40.  She enjoys working in the
yard, but does only "a little."  AR 40.  When asked about television, Plaintiff indicated the
television is not on during the day, but she typically watches about two hours in the evening.  AR
40. She reads the bible and self help books.  AR 40-41.  She spends about a half an hour every
day on the computer, checking email.  AR 41.  She watches her children play school sports, but
does not make it to all the games.  AR 41, 46.  She is no longer a member of any clubs or
organizations.  AR 41-45.  Plaintiff attends religious services occasionally or about once a
month.  AR 41, 45.  She seldom socializes with friends because she does not physically feel well
enough to do so.  AR 42, 45.

Plaintiff estimated she could walk for about thirty minutes, stand for about an hour and sit
for about an hour.  She can lift about fifteen pounds.  AR 42.  After the onset of disability in mid
2006, it became necessary for Plaintiff to lie down about six times a day, for about twenty
minutes at a time, in an eight-hour time period.  AR 43.  If she were to be on her feet for thirty to
sixty minutes, her legs would give out.  AR 43.  The pain worsens with either walking or
standing.  AR 46.

With regard to her upper extremities, Plaintiff indicated that on a good day she could
handle, write and reach for about thirty minutes before needing to rest, and then could resume the

4

1   activity after about fifteen minutes.  However, it would get progressively more difficult

2   throughout a day.  AR 43-44.

3       VE Chandler classified Plaintiff's past work as: grocery clerk, medium as performed and

4   semi-skilled with an SVP[3] of three; and loan officer, sedentary and skilled with an SVP of 6.  AR

5   49-50.

6       The VE was asked to consider a hypothetical worker of Plaintiff's age, education and

7   work history, whom could lift and carry twenty pounds occasionally and ten pounds frequently,

8   whom could stand or walk for two hours in an eight-hour day, sit for six hours in an eight-hour

9   day, and could occasionally climb, balance, stoop, kneel, crouch and crawl, but whom was to

10  avoid concentrated exposure to heights and dangerous machinery.  AR 51.  The VE indicated

11  such an individual could perform Plaintiff's past relevant work as a loan officer.  AR 51.

12      In a second hypothetical, the VE was asked to assume the same hypothetical worker with

13  the additional limitations of depression and anxiety, and the ability to perform simple, routine

14  work activities.  AR 51.  VE Chandler indicated the individual would be unable to perform

15  Plaintiff's past relevant work, but could perform other sedentary, unskilled work.  AR 51-52.

16      In a third hypothetical, the VE was asked to consider a hypothetical worker of Plaintiff's

17  age, education and work history, whom could lift and carry five pounds, and whom could sit for

18  two hours and stand or walk for one hour each in an eight-hour day.  AR 52.  The VE indicated

19  that such an individual could not perform Plaintiff's past relevant work nor any other work in the

20  national economy.  AR 52.

21      Plaintiff's counsel asked the VE to consider the same individual as posed in the second

22  hypothetical with an additional limitation to no more than occasional use of the upper

23  extremities.  The VE indicated that the sedentary, unskilled work would be unavailable to such a

24  worker.  AR 52.

25

26

27      [3]"SVP" refers to specific vocational preparation.

28                                  5

1

**Medical Record**

2          The entire medical record was reviewed by the Court.  AR 139-267.  Relevant medical

3 evidence will be referenced below if necessary to this Court's decision.

4          **ALJ's Findings**

5          Using the Social Security Administration's five-step sequential evaluation process, the

6 ALJ determined that Plaintiff did not meet the disability standard.  AR 14-25.

7          More particularly, the ALJ found that Plaintiff last met the insured status requirements on

8 March 31, 2007,[4] and had not engaged in substantial gainful activity since May 15, 2006.  AR 16.

9 Further, the ALJ identified arthritis of the knees and fibromyalgia as severe impairments.  AR

10 16-18.  Nonetheless, the ALJ determined that the severity of the Plaintiff's impairments do not,

11 individually or in combination, meet or exceed any of the listed impairments.  AR 18-19.

12          Based on his review of the entire record, the ALJ determined that Plaintiff has the

13 residual functional capacity ("RFC") to lift and carry twenty pounds occasionally and ten pounds

14 frequently, to stand and/or walk for two hours in an eight-hour work day, to sit for six hours in an

15 eight-hour workday with normal breaks, with unlimited pushing and pulling, and occasional

16 climbing, balancing, stooping, kneeling, crouching or crawling; she was to avoid concentrated

17 exposure to hazardous machinery and heights, and uneven terrain.  AR 19-24.

18          Next, the ALJ determined that Plaintiff could perform her past relevant work as a loan

19 officer.  AR 24-25.  Therefore, the ALJ determined Plaintiff was not disabled.  AR 25.

20          **SCOPE OF REVIEW**

21          Congress has provided a limited scope of judicial review of the Commissioner's decision

22 to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

23 this Court must determine whether the decision of the Commissioner is supported by substantial

24 evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla,"

25

26          [4] A claimant must establish a disability onset date prior to the expiration of his or her disability insured

27 status.  See 20 C.F.R. § 404.131.

28          6

1  *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

2  *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

3  reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

4  401.  The record as a whole must be considered, weighing both the evidence that supports and

5  the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

6  995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

7  apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

8  This Court must uphold the Commissioner's determination that the claimant is not disabled if the

9  Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

10  substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

11  Cir. 1987).

12  **REVIEW**

13  In order to qualify for benefits, a claimant must establish that he is unable to engage in

14  substantial gainful activity due to a medically determinable physical or mental impairment which

15  has lasted or can be expected to last for a continuous period of not less than twelve months.  42

16  U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

17  such severity that he is not only unable to do her previous work, but cannot, considering his age,

18  education, and work experience, engage in any other kind of substantial gainful work which

19  exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

20  The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

21  Cir. 1990).

22  Here, Plaintiff argues the ALJ failed to properly evaluate her impairment pursuant to

23  Listing 1.02A, failed to properly evaluate her mental impairment, and failed to articulate specific

24  and legitimate reasons for rejecting the opinion of her treating physician.  (Doc. 10 at 8-16.)

25

26

27

28                                              7

1

## DISCUSSION[5]

2      Plaintiff contends ALJ Kopicki erred with regard to his findings at step two.

3      ***Step Two Evaluations***

4      At step two of the sequential evaluation process, the ALJ must conclude whether Plaintiff

5      suffers from a "severe" impairment.  The regulations define a non-severe impairment as one that

6      does not significantly limit the claimant's physical and mental ability to do basic work activities.

7      An impairment is not severe "if the evidence establishes a slight abnormality that has 'no more

8      than a minimal effect on an individual's ability to work.'"  *Smolen v. Chater*, 80 F.3d 1273, 1290

9      (9th Cir. 1996).  To satisfy step two's requirement of a severe impairment, the claimant must

10     prove the existence of a physical or mental impairment by providing medical evidence consisting

11     of signs, symptoms, and laboratory findings; the claimant's own statement of symptoms alone

12     will not suffice.  20 C.F.R. §§ 404.1508, 416.908.  The effects of all symptoms must be

13     evaluated on the basis of a medically determinable impairment which can be shown to be the

14     cause of the symptoms.  20 C.F.R. §§ 404.1529, 416.929.  An overly stringent application of the

15     severity requirement violates the statute by denying benefits to claimants who do meet the

16     statutory definition of disabled.  *Corrao v. Shalala,* 20 F.3d 943, 949 (9th Cir. 1994).

17     The step two inquiry is a *de minimis* screening device to dispose of groundless or

18     frivolous claims.  *Bowen v. Yuckert,* 482 U.S. 137, 153-154 (1987).  Further, the ALJ must

19     consider the combined effect of all of the claimant's impairments on his ability to function,

20     without regard to whether each alone was sufficiently severe.  42 U.S.C. § 423(d)(2)(B).  The

21     combined effect "shall be considered throughout the disability determination process."  *Id.*  The

22     adjudicator's role at step two is further explained by Social Security Ruling ("SSR") 85-28:

23              A determination that an impairment(s) is not severe requires a careful
        evaluation of the medical findings which describe the impairment(s) and an
24     informed judgment about its (their) limiting effects on the individual's physical

25

26     [5]The Court carefully reviewed and considered all of the pleadings, including arguments, points and
       authorities, declarations, and/or exhibits.  Any omission of a reference to any specific argument or pleading is not to
27     be construed that this Court did not consider the argument or pleading.

28                                                8

and mental ability(ies) to perform basic work activities; thus, an assessment of function is inherent in the medical evaluation process itself. At the second step of sequential evaluation, then, medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities.

### Listing 1.02A

Plaintiff contends she meets or exceeds Listing 1.02 with regard to the impairment of her left knee.  (Doc. 10 at 8-11.)  The Commissioner argues to the contrary, asserting the ALJ did not err because the record supports his finding.  (Doc. 11 at 6-10.)

The listings of impairments describe impairments "that are considered severe enough to prevent an adult from doing any gainful activity."  20 C.F.R. § 416.925(a).  Most of these impairments are permanent or expected to result in death.  *Id.*  For all other impairments, the evidence must show that the impairment has lasted or is expected to last for a continuous period of at least 12 months.  *Id.*  If a claimant's impairment meets or equals a listed impairment, he or she will be found disabled at step three without further inquiry.  20 C.F.R. § 416.920(d).

To demonstrate that an impairment matches a listed impairment, the claimant must show that the impairment meets all of the medical criteria in a Listing.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Id.*  To "equal" a listed impairment, a claimant must establish symptoms, signs and laboratory findings "at least equal in severity and duration" to the characteristics of a relevant listed impairment."  *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999); 20 C.F.R. §§ 404.1526(a), 416.926(a).  Under the law of this circuit, "[i]t is unnecessary to require the Secretary, as a matter of law, to state why a claimant failed to satisfy every different section of the listing of impairments."  *Gonzales v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990).

Listing 1.02 provides as follows:

> ***Major dysfunction of a joint(s) (due to any cause***): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on

9

appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

     A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

       OR

     B.  Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

Relatedly, Listing 1.00B2 provides as follows:

     B. Loss of function.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

     2. How we define loss of function in these listings.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

     b. What we mean by inability to ambulate effectively.

     (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

     (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Here, the ALJ determined as follows:

     The impairments listed in Appendix 1, Subpart P, CFR Part 404, which are most nearly applicable to the claimant's medically determinable impairments, particularly Section 1.00 pertaining to disorders of the musculoskeletal system, have been reviewed and are not met or medically equaled under the facts of this case.

     To meet or medically equal the criteria under Section 1.00 the claimant must experience a loss of function, defined for purposes of these listings as the inability to ambulate effectively on a sustained basis for any reason including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine or gross movements effectively on a sustained basis for any reason

which has lasted, or is expected to last for at least 12 months.

An inability to ambulate effectively means an extreme limitation of the ability to walk, i.e., an impairment that interferes very seriously with the individual's ability to independently initiate, sustain or complete activities, and to ambulate effectively an individual must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities [of] daily living.

Examples of ineffective ambulation including, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping or banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

Examples of the inability to perform fine and gross movements effectively include, but are not limited, to the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet or above waist level.

Because the claimant's hearing testimony and the medical evidence record do not support a finding of functional loss, the claimant's impairments do not meet or medically equal one of the listed impairments . . ..

AR 18-19, internal citations omitted.

Plaintiff was found to have the severe impairment of arthritis of the knees. Assuming Plaintiff's medical records do establish that her impairment is characterized by a gross anatomical deformity, chronic joint pain and stiffness with signs of limitation of motion, and findings of joint space narrowing, bony destruction, or ankylosis of the affected knees, Plaintiff cannot establish an inability to ambulate effectively.

Plaintiff directs the Court's attention to the ALJ's RFC notation that she "avoid uneven terrain," arguing that the ALJ's finding establishes her inability to ambulate effectively. This Court is not persuaded.

As Listing 1.00B2 makes clear, an ability to sustain a reasonable walking pace over a sufficient distance, carrying out the activities of daily living, means an individual can ambulate effectively. Plaintiff herself testified that she could walk for about thirty minutes before needing to rest. AR 42-43. Other than an occasional difficulty getting out of bed followed by standing or walking, Plaintiff herself made no mention of any difficulty ambulating. *See* AR 54-55. Moreover, Plaintiff attributed that difficulty to fibromyalgia, rather than her knee impairment.

11

AR 54-55.  Additionally, as noted in the ALJ's decision, the medical record does not contain any evidence that Plaintiff cannot effectively ambulate.  Also, this Court notes the medical record references Plaintiff playing softball and running the bases after the date she alleges she became disabled.  Clearly her ability to run after the onset of her disability means she cannot establish her impairment lasted for a continuous period of at least twelve months.

Moreover, a limitation to avoiding uneven terrain is not a sufficiently extreme limitation warranting a finding that Plaintiff is unable to ambulate effectively.  The legal authority upon which Plaintiff relies in support of her argument is unavailing as it is factually distinguishable. Here, similar to the claimant in *Gaddie v. Astrue*, 2011 WL 5436261 (C.D. Cal. Nov. 9, 2011) *2, Plaintiff is "attempting to bootstrap the ALJ's imposition of limitations for purposes of the RFC assessment to the Step Three analysis . . .."  *Id*. at *3.  Like the Central District's holding notes, the ALJ did not find Plaintiff incapable of walking on uneven terrain, rather that she should avoid doing so.

The record establishes that ALJ Kopicki considered this issue in light of all of the evidence presented in the medical record and at the hearing.  *See Lewis v. Apfel*, 236 F.3d 503, 513–14 (9th Cir. 2001).  In sum, the ALJ did not err in finding that Plaintiff did not meet or equal a listed impairment.  Those findings are supported by substantial evidence and are free of legal error.

### Plaintiff's Mental Disorder

Next, Plaintiff asserts that the ALJ erred because having been on notice that she had sought treatment from a mental health provider, "the Commissioner made no effort whatsoever to have this case reviewed and assessed by a psychiatrist and psychologist in compliance with the regulations."  (Doc. 10 at 12.)  The Commissioner counters that no error occurred.  (Doc. 11 at 10-11.)

With specific regard to Plaintiff's alleged mental disorder, the ALJ made the following findings:

The claimant's reported mental impairment of mood disorder was also first diagnosed, as ascertained from available records, *after her date last insured*. Assuming, arguendo, that it existed prior to the date last insured, there is no evidence that it caused more than minimal limitation in the claimant's ability to perform basic mental work activities and was therefore nonsevere.

In making this findings, I have considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments. There four broad functional areas are known as the "paragraph B" criteria.

The first functional area is activities of daily living. In this area, the claimant had mild limitation. The claimant alleges she [has] fibromyalgia resulting in severe pain which she claims results in feeling hopeless. The claimant testified that she wants to do thing but she cannot. The claimant testified that when she can, she makes her children breakfast and drives her children to school, cleans her kitchen and does chores around the house including laundry, and she attends her children's sporting events.

The next functional area is social functioning. In this area, the claimant had mild limitation. The claimant testified that she seldom socialized because she doesn't feel physically well, but the claimant also testified that she socialized with others at her children's school sports and little league games. The claimant sometimes attends religious services.

The third functional area is concentration, persistence or pace. In this area, the claimant had mild limitation. The claimant testified that her medications cause her confusion all the time; however, the medical evidence shows the claimant has not reported these alleged negative side effects to her prescribing physician. When reported, the side effects of pain control medication are "mild" on March 1, 2008, no "mental cloudiness"; "alert, oriented" on September 24, 2008, and no "mental cloudiness" on May 4, 2009.

The fourth functional area is episodes of decompensation. In this area, the claimant had experienced no episodes of decompensation which have been of extended duration. There is no evidence in the medical record that the claimant has been hospitalized or received crisis intervention for a mental health condition or diagnosis.

Because the claimant's medically determinable mental impairment caused no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, it was nonsevere.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

As indicated, *the claimant did not seek a mental health evaluation or mental health treatment until July 1, 2008, after the date last insured*, when she was evaluated by Loren Anderson L.C.S.W. one time. Based on that evaluation the claimant was assigned a diagnosis of mood disorder due to fibromyalgia with depressive features. There is no evidence of any prior mental health treatment and the claimant did not attend any therapy sessions with Ms. Anderson. There is no mental health treatment plan in the medical evidence record.

Ultimately, I assign little weight to the evaluation and diagnosis of Ms. Anderson as there is no basis for her conclusions other than symptoms reported by the claimant, there is no treatment plan and the claimant did not engage in any therapeutic sessions with Ms. Anderson following the initial evaluation, which appears to have been procured in preparation for Disability Insurance Benefits, and there are no notes or basis for Ms. Anderson's conclusions apart from the symptoms the claimant reported to her. Moreover, Ms. Anderson is not an

13

1
2

acceptable medical source for establish[ing] the existence of a medically determinable impairment.

3  AR 17-18, emphasis added & internal citations omitted.  Interestingly, Plaintiff makes no

4  reference to these findings by the ALJ.  As noted by the Commissioner, despite the fact the

5  medical evidence to which Plaintiff refers falls outside the relevant disability period - the period

6  between the alleged onset of disability in May 2006, through Plaintiff's date last insured on

7  March 31, 2007 - the ALJ considered the evidence.

8      Plaintiff has offered no legal authority to support her position that reversible error has

9  occurred where the limited mental health treatment obtained happened after the date last insured.

10  The Court has found no such authority.  The Court does note that Plaintiff's application for

11  benefits makes no mention of any mental impairment.  *See* AR 120 ("fibromyalgia, bad knees");

12  *see also* AR 69, 74.

13      A mental impairment must be established by medical evidence consisting of signs,

14  symptoms, and laboratory findings.  20 C.F.R. § 416.908.  Symptoms are a claimant's own

15  description of his or her impairment, and alone are not enough to establish a mental impairment;

16  signs include observable psychological abnormalities and must be medically demonstrable

17  phenomena;  laboratory findings must be shown through medically acceptable laboratory

18  techniques.  20 C.F.R. § 416.928.  The regulations are clear that reports about a claimant's

19  impairments must come from "acceptable medical sources," and that a licensed social worker is

20  not an accepted medical source.  20 C.F.R. § 416.913(a).

21      To determine whether a plaintiff has a mental impairment, one must assess the

22  impairment according to the Regulations.  20 C.F.R. pt. 404, app. 1, subpt. P, § 112.05 (Listing

23  12.05).  The listing of impairments outlines criteria that claimants must meet in order to be

24  determined impaired.  *Id.*  Here, despite the fact that the mental health treatment obtained

25  occurred with an unacceptable medical source *and* outside the date Plaintiff is considered to be

26  last insured, ALJ Kopicki provided a reasoned and thorough analysis of Plaintiff's alleged

27
28                                                    14

1  impairment.  This Court has determined that the ALJ did not err.  Furthermore, his findings are

2  supported by substantial evidence.

3  ***Evaluation of Medical Opinion Evidence***

4  Plaintiff asserts the ALJ failed to articulate specific and legitimate reasons for rejecting

5  the opinion of her treating physician, Dr. Winkler.  (Doc. 10 at 13-16.)

6  **1.      Applicable Legal Standard**

7  Cases in this circuit distinguish among the opinions of three types of physicians: (1) those

8  who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

9  (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining

10  physicians).  As a general rule, more weight should be given to the opinion of a treating source

11  than to the opinion of doctors who do not treat the claimant.  *Winans v. Bowen*, 853 F.2d 643,

12  647 (9th Cir. 1987).  At least where the treating doctor's opinion is not contradicted by another

13  doctor, it may be rejected only for "clear and convincing" reasons.  *Baxter v. Sullivan*, 923 F.2d

14  1391, 1396 (9th Cir. 1991).  Even if the treating doctor's opinion is contradicted by another

15  doctor, the Commissioner may not reject this opinion without providing "specific and legitimate

16  reasons" supported by substantial evidence in the record for so doing.  *Murray v. Heckler*, 722

17  F.2d 499, 502 (9th Cir. 1983).

18  The opinion of an examining physician is, in turn, entitled to greater weight than the

19  opinion of a nonexamining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990);

20  *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir. 1984).  As is the case with the opinion of a treating

21  physician, the Commissioner must provide "clear and convincing" reasons for rejecting the

22  uncontradicted opinion of an examining physician.  *Pitzer*, 908 F.2d at 506.  And like the opinion

23  of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor,

24  can only be rejected for specific and legitimate reasons that are supported by substantial evidence

25  in the record.  *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).

26

27

28

1    The opinion of a nonexamining physician cannot, by itself, constitute substantial evidence

2    that justifies the rejection of the opinion of either an examining physician or a treating physician.

3    *Pitzer v. Sullivan*, 908 F.2d at 506 n.4; *Gallant v. Sullivan*, 753 F.2d at 1456.  In some cases,

4    however, the ALJ can reject the opinion of a treating or examining physician, based in part on the

5    testimony of a nonexamining medical advisor.  *E.g., Magallanes v. Bowen,* 881 F.2d 747, 751-55

6    (9th Cir. 1989); *Andrews v. Shalala*, 53 F.3d at 1043; *Roberts v. Shalala*, 66 F.3d 179 (9th Cir.

7    1995).  For example, in *Magallanes*, the Ninth Circuit explained that in rejecting the opinion of a

8    treating physician, "the ALJ did not rely on [the nonexamining physician's] testimony alone to

9    reject the opinions of Magallanes's treating physicians . . .."  *Magallanes*, 881 F.2d at 752.

10   Rather, there was an abundance of evidence that supported the ALJ's decision: the ALJ also

11   relied on laboratory test results, on contrary reports from examining physicians, and on testimony

12   from the claimant that conflicted with her treating physician's opinion.  *Id*. at 751-52.

### 2.      ALJ's Evaluation

ALJ Kopicki found as follows:

> The medical evidence shows that the claimant sustained an injury to her knee while playing softball approximately one month prior to August 2, 2006.  A physical therapist's evaluation describes her history of injuring her left knee joint "when she was playing softball.  This was approximately one month ago.  Patient reports that she was running to second base and when she went to slow down to get to the base she felt a popping sensation in her left knee joint.  Later that evening and the next day she started having quite a bit of swelling around her left knee joint.
>
> The claimant was referred to orthopedic surgeon Dr. Caton by her family physician Dr. Winkler, and an evaluation was performed by Dr. Caton on August 30, 2006.  In his report he remarks, "Her knee has been tender and painful.  She originally injured it while playing softball."
>
> Chronologically, the earliest medical record from primary treating physician Dr. Winkler in the medical evidence record is dated August 21, 2006 it is noted "See PT notes 8/17/06".  On August 24, 2006 MRI results are noted, an orthopedic evaluation is recommended and the claimant was "off work until 02 Oct. 06, as per ortho."  There is a notation that EDD forms were mailed.
>
> The[] next documented visit with Dr. Winkler [is] on March 10, 2007 on which there is a notation of "fibromyalgia" and diagnosis code in the margin.  The claimant was examined for "toenails" and "bilateral knee pain (s/p arthroscopy Nov. 07)" and the claimant was treated with diflucan 100 mg, continued on Voltaren and started on fluoxetane 20 mg.
>
> On April 20, 2007 the claimant was seen by Dr. Winkler and it is documented on that date that the claimant was complaining of a diagnosis of

16

fibromyalgia and wanted medication.  The first documentation in the medial evidence record of any evaluation of the claimant for symptoms of fibromyalgia, or assessment of fibromyalgia related trigger points, was on that date.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Dr. Winkler opined on August 1, 2007 "Ongoing inability to pursue gainful employment.  Pursue S.D.I extension + SSI application."  The word "substantial" is added in capital letters above the phrase "pursue gainful".  On August 30, 2007 Dr. Winkler noted the claimant had "severe pain rated 8-10, can't walk, can't sleep if no narcotic use, 3-5 with narcotic use."  On that date Dr. Winkler again opined "currently unable to pursue gainful employment."

On April 20, 2008 Dr. Winkler completed a questionnaire entitled "The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia" on which he indicated the presence of all 18 tender points and commented, "Widespread reproducible pain with variable intensity, usually severe, with poor response to aggressive pain management regimen".  Dr. Winkler opined that the claimant was precluded from performing any full-time work at any exertion level including sedentary level, due to primary impairments of fibromyalgia, degenerative joint disease, depression and anxiety, and he indicated that he based his opinion on bilateral persistent trigger point pain, widespread reduced range of motion and pain of "R. knee" noting, "sits and stands with difficulty" and observes psychomotor retardation and flattened affect.

Dr. Winkler opined the claimant could sit for 2 hours and stand and/or walk for 1 hour in an 8-hour work day, and must lie down or elevate her legs for 3-6 hours per day on bad days, and 1-2 hours per day on good days.  Additionally, Dr. Winkler indicated the claimant had hand impairments with a diagnosis of "intermittent paresthesias, weakness and swelling of fingers bilaterally, the severity of which interferes with action of daily living" and he noted the laboratory abnormality of Epstein Barr virus (EBV) positivity as associated with the diagnosis.

Dr. Winkler opined that as a result of the hand impairments the claimant could lift 0-5 pounds but more weight will cause exacerbation of muscle pains and spasms.  Finally Dr. Winkler opined the claimant could use her hands to reach for less than 2 hours, handle for 1-2 hours but not repetitive, feel for 1-2 hours impaired by paresthesias, pushing/pulling for less than 2 hours, grasp less than 2 hours, and the claimant could perform reaching, handling, feeling pushing and pulling, and grasping for less than 1 hour without resting the hands.  Dr. Winkler indicated that he believed the claimant has been disabled to the degree "set forth above" since July 2006.

I have assigned little weight to the opinions of Dr. Winkler.  Firstly, the medical evidence record fails to establish that the claimant received any evaluation or treatment of fibromyalgia prior to the date last insured of March 31, 2007.  As discussed above, the first documentation of evaluation or treatment of the claimant for fibromyalgia on the record is on April 20, 2007, other than the appearance of the word "fibromyalgia" on March 10, 2007, with no corresponding discussion, subjective complaints by the claimant, or objective signs recorded on that entry.  On that date the record reflects that the claimant sought treatment for her toenails and bilateral knee pain.  The claimant apparently told Lauren Anderson , LCSW, that she had been diagnosed with fibromyalgia in 1994 by a chiropractor.  There are no records of this, but assuming it is true a chiropractor is not an acceptable medical source for providing evidence to establish an impairment.

17

Secondly, the claimant's testimony regarding the onset of her symptoms and the medical evidence of record is inconsistent to the extent that the claimant does not appear to have been treated for pain related medical impairments prior to injuring her knee playing softball during June or July of 2006. The claimant was running around bases, playing softball during the period she is now alleging she was disabled and unable to work because, according to her testimony, she was not feeling good and her knees were hurting. There are no medical records in evidence indicating she was being treated for any pain related impairments prior to injuring her knee, supporting a conclusion that the claimant was not impaired on the alleged onset date of May 15, 2006, nor was the claimant impaired in July 2006 when Dr. Winkler opined the claimant was disabled due to fibromyalgia, degenerative joint disease, depression and anxiety as well as bilateral hand impairments. The record shows that at that time the claimant was complaining only of pain in her left knee as a result of her softball injury.

Furthermore, the claimant did not complain of pain in her right knee until May 31, 2007 which Dr. Winkler attributed to "possible over-use due to favoring left". A subsequent MRI of the claimant's right knee showed only mild chondromalacia. On that date Dr. Winkler also opined the claimant "may need to find part time work or if doing worse may be unable to pursue gainful employment" a statement that is inconsistent with his subsequent opinion, dated April 20, 2008, when he opined that the claimant was disabled [in] July 2006.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

It was not until May 14, 2008 that the claimant underwent a rheumatology consultation with Dr. Schunke for evaluation of history of fibromyalgia and a diffuse musculoskeletal pain which the claimant alleged started in 1997. Dr. Schunke's physical examination of the claimant revealed intact motor strength and deep tendon reflexes, normal joints of the hands and wrists with full shoulder rotation and unlimited cervical spine motion. The claimant's right knee joint was normal but there was a small effusion with full flexion on her left knee at the site of previous surgery. He[r] hip rotations were full with moderate trochanteric tenderness bilaterally and there was no posterior cervical muscular tenderness or tenderness about the subscapular areas.

Dr. Schunke commented that "Her musculoskeletal pain seems consistent with fibromyalgia. There does not appear to be evidence on examination of previous lab studies or inflammatory joint disease." He also added "I am sorry not to be of more definitive help with this difficult problem". He did not comment on the claimant's ability to work.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The State agency evaluators opined that, based on the objective evidence and the claimant's diagnosis of grade III chondromalacia in her left knee and mild chondromalacia in her right knee, the claimant was able to perform sedentary work with postural limitations. The State agency [evaluators] noted that there was no detailed examination of the claimant to confirm a diagnosis of fibromyalgia until after the claimant's date last insured. I accord significant weight to these opinions as the State agency medical consultants are well-versed in the assessment of functionality as it pertains to the disability provisions of the Social Security Act, as amended. As indicated earlier, however, I have nevertheless considered the fibromyalgia as if it existed prior to the date last insured.

I give little weight to Dr. Winkler's opinions for the reasons mentioned. His opinions, for the periods in question, are not supported by the medical evidence of record. The claimant injured her knee, but was not receiving treatment for fibromyalgia, bilateral hand impairments, depression and anxiety

prior to her date last insured nor do contemporaneous treatment notes make any significant mention of these problems.

In sum, the above residual functional capacity assessment is supported by the claimant's level of activity up to the time of her knee injury sustained while running during a softball game and inconsistent reports to Dr. Winkler, Dr. Canton, her physical therapists, and her vague and inconsistent testimony which, certainly in the case of the claimant's alleged knee pain from unknown causes on the alleged onset date, is totally unsupported by the medical evidence record. The record clearly shows that after the alleged onset date the claimant was playing softball and while being treated for her knee injury she did not mention or complain of her alleged history of fibromyalgia in any of her orthopedic or physical therapy evaluations.

As indicated, the claimant's testimony was vague. She reported pain everywhere due to fibromyalgia and that she had it a long time. I asked her why she stopped working and she was initially unable to provide an answer though she later said her condition worsened. She did not mention her softball injury. At the close of the hearing I asked her [if] there was anything else she wanted to add and she stated she did not think she said enough about her fibromyalgia. So I gave her an opportunity to testify further. She could not, however, think of anything to say so her representative asked her a series of leading questions to which she responded in the affirmative. Considering her testimony in relation to the record I do not find her fully credible . . ..

AR 21-25, internal citations omitted.[6]

### 3.    Analysis

Dr. Winkler's opinions were contradicted by the opinions of other physicians, thus the ALJ was required to provide specific and legitimate reasons for rejecting it. In fact, ALJ Kopicki provided specific and legitimate reasons for doing so, accompanied by a very thorough explanation as quoted above. First, the ALJ indicated that he gave Dr. Winkler's opinion very little weight because the medical evidence does not support the opinion; this is a specific and legitimate reason. A lack of supporting clinical findings is a valid reason for rejecting a treating physician's opinion. *Magallanes v. Bowen*, 881 F.2d at 751. Second, the ALJ indicated he gave Dr. Winkler's opinion very little weight because Plaintiff's own testimony was inconsistent with the medical evidence. Again, the ALJ provided a specific and legitimate reason because an ALJ can consider a claimant's testimony in conflict with her treating physician's opinion. *Magallanes*

---

[6]This Court has reviewed the ALJ's summary of the medical record and concludes that it is comprehensive and thorough, therefore, the Court has not independently summarized the documentation here.

1    *v. Bowen*, 881 F.2d at 751-52.  The ALJ also noted that Dr. Winkler's opinion was internally

2    inconsistent.  Rejecting an opinion that contains internal inconsistencies is a specific and

3    legitimate reason to discount the opinion.  *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995).

4          ALJ Kopicki afforded the opinions of the state agency evaluators substantial weight

5    because the opinions were consistent with the record.  When the ALJ rejects the opinion of an

6    examining physician in reliance on the non-examining physician, "reports of the nonexamining

7    advisor need not be discounted and may serve as substantial evidence when they are supported by

8    other evidence in the record and are consistent with it."  *Andrews v. Shalala*, 53 F.3d at 1041;

9    *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996); *Magallanes v. Bowen*, 881 F.2d at 751-752.

10         This Court's review of the medical record confirms that the ALJ's findings are very

11   clearly supported by substantial evidence and are free of legal error.

12                                           <u>**CONCLUSION**</u>

13         Based on the foregoing, the Court finds that the ALJ's decision is supported by

14   substantial evidence in the record as a whole and is based on proper legal standards.

15   Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the

16   Commissioner of Social Security.  The Clerk of this Court is DIRECTED to enter judgment in

17   favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff,

18   Jenny J. Jantz.

19

20         IT IS SO ORDERED.

21    **Dated:   November 18, 2011**              _____/s/ **Gary S. Austin**_____
22                                              UNITED STATES MAGISTRATE JUDGE

23

24

25

26

27

28                                           20